(37 Misc. Rep. 435.)

## ROUX v. ROTHSCHILD et al.

### (Supreme Court, Special Term, New York County. March, 1902.)

BILL OF SALE—CANCELLATION—UNCONSCIONABLE CONTRACT.

A transaction under which an annuitant received less than $2,700 for annuities presumably worth $20,400 will be set aside as unconscionable.

Action by Charles Roux against Emma Rothschild and others to cancel certain powers of attorney and bills of sale. Judgment for plaintiff.

Hunt, Hill & Betts, for plaintiff.

Turner & Stevenson, for defendant Rothschild.

Turner, Rolstan & Horan, for defendant the Farmers' Loan & Trust Company.

STECKLER, J.   By the will of his grandfather the plaintiff was in 1898 entitled to an annuity of $1,200, payable in quarterly installments of $300.   Being in need of money, the plaintiff, in May of that year, attracted by a newspaper advertisement, went to the office of the Ætna Loan Association,—the name under which defendant carried on business.   There he saw defendant's husband, made application for a loan, agreed to take $200 for his $300 annuity installment due August 1st, received the $200, and gave defendant a power of attorney authorizing her to collect the August installment from the Farmers' Loan & Trust Company, trustee. of his grandfather's estate.   From time to time plaintiff obtained more money from defendant, and in payment thereof delivered to her powers of attorney to collect his annuity from the trustee, so that in February, 1900, the date of the last payment to plaintiff, he had received from the defendant moneys aggregating $2,614.50, for which he had given her powers of attorney authorizing her to collect from the trustee in payment of said sum the amount of $20,400, which last-named figure includes installments of annuity from August 1, 1898, to November 1, 1915, inclusive.   On or about January 11, 1901, plaintiff, who was then 34 years of age, revoked the powers of attorney; and on that date the defendant had received from the trustee, under the powers of attorney received from the plaintiff, the total sum of $2,700.   During the entire period of his transactions with defendant, the plaintiff was a heavy drinker of intoxicating liquors.   He had no bank account, and, except that once in a while he sang in vaudeville, had no occupation.   He spent his time between New York and Montreal.   So much addicted was he to drink, that, according to the testimony of one of the witnesses, there was hardly a time during 1898 when plaintiff was sober, and his mind was so affected by his drinking habits that he was known among his friends as the "crazy Frenchman."   He himself swore that he was never sober when he went to defendant's place of business; that, although he was not exactly drunk, he suffered to such an extent from the effects of liquor that he lost control of himself, and did not know what he was doing. The defendant claims there was only one loan made to plaintiff—that in May or June, 1898, the first transaction; that, whenever thereafter

the plaintiff obtained money from defendant, he gave her a bill of sale of one or more installments of his annuity; and she produced the bills of sale upon the trial. The defendant, however, on each occasion, took a power of attorney from plaintiff. It was on these powers of attorney that she obtained installments of annuity from the trustee, and it was not until after the revocation of the powers of attorney that defendant claimed the annuity under the bills of sale. The plaintiff testified that he never heard anything about bills of sale until 1901; that he signed any and all papers handed to him by defendant's husband and her attorney, without reading them; that he did not know for how many installments he gave powers of attorney, and did not know the difference; that he understood that all the papers he signed were powers of attorney; and that he depended on the honesty of defendant's husband, who was her agent during the dealings between the parties. The entries in defendant's books throw light on the character of the transactions claimed by defendant to be sales. The account with plaintiff is in the ordinary debtor and creditor form. The plaintiff is charged with the amounts received by him, and credited with the installments collected and to be collected from the trustee; and the difference between the amount received by plaintiff, and the value of the annuities given in payment thereof, is made up by a charge for "services." For instance, in January and February, 1900, the plaintiff is charged with "cash," $275, and "services," $5,725. It also appears that, on one occasion when plaintiff applied to defendant's agent for money, Rothschild sent for an insurance agent, required plaintiff to undergo a physical examination at defendant's office, received two policies,—one for $2,000, and the other for $3,000,—and had the plaintiff execute assignments of the policies to defendant. In each case the assignment was made in consideration of an indebtedness to defendant, and defendant retained possession of the policies. One of the policies was assigned as "collateral security" for the indebtedness. The fact that defendant has allowed these policies to lapse does not weaken the plaintiff's position.

Contracts for annuities, if made in good faith and not designed to conceal usurious interest, are not within the statute against usury; an annuity being regarded as property capable of being sold on such terms as the parties agree upon. And a mere application for a loan does not convert an annuity which yields a profit beyond legal interest into a usurious contract. But an actual contract for a loan, converted into a sale of an annuity in order to avoid the law, is within the condemnation of the statute. Scott v. Lloyd, 9 Pet. 418, 449, 9 L. Ed. 178; Id., 4 Pet. 205, 7 L. Ed. 833; Howkins v. Bennet, 97 E. C. L. 507; Marsh v. Martindale, 3 Bos. & P., at page 159; Trust Co. v. Krumsieg, 172 U. S. 351, 19 Sup. Ct. 179, 43 L. Ed. 474. Taking all the facts proved into consideration,—the original application for a loan, and the subsequent applications, the giving of the powers of attorney, the insurance of plaintiff's life at the request of defendant's agent, and the assignment of the policies to her, together with the entries in defendant's book,—I feel constrained to adhere to the opinion expressed at the close of the trial, that the transactions be-

tween the parties were usurious loans. The usurer is ever on the alert for methods to evade the statute, but a court of justice will always go beyond the mere form, so as to ascertain the substance of alleged usurious contracts.

But even if there was a sale of the annuity, and not a loan, the plaintiff should prevail. In Dunn v. Chambers, 4 Barb. 376, defendant purchased for $100 property worth $650, and paid only $70 of the purchase price. The plaintiff was an intemperate and imprudent young man, but was sober when he executed the deed to defendant. The court said (page 380):

"Such a bargain, without reference to the circumstances under which it was made, might properly, I think, be attributed to the second class of frauds enumerated by Lord Hardwicke in Chesterfield v. Janssen, 2 Ves. Sr. 155, which he describes to be 'such bargains as no man in his senses, and not under a delusion, would make on the one hand, and as no honest and fair man would accept on the other.' * * * I cannot say that the evidence is sufficient to justify a decree declaring the deed fraudulent in fact, and yet it was obtained under such circumstances as to render it at least unfair for the defendant to retain the full advantage of his bargain. Complete justice may be done to both parties by allowing the deed to stand as a security for the defendant's indemnity."

See, also, Boyd v. Dunlap, 1 Johns. Ch. 478; Friedman v. Hirsch, 44 N. Y. St. Rep. 199, 18 N. Y. Supp. 85; Osgood v. Franklin, 2 Johns. Ch. 1, 7 Am. Dec. 513; Earl of Aylesford v. Morris, 8 Ch. App. 484; Castoriano v. Dupe, 145 N. Y. 250, 39 N. E. 1035.

In this action the difference between the alleged purchase price and the property sold is far more glaring than in the Dunn Case, for the plaintiff received less than $2,700, while the value of the annuities claimed by defendant is $20,400.

If these views are right, it is unnecessary to consider the question whether plaintiff could, under the real property law, sell his annuity, or any part thereof. There must be judgment for plaintiff.

Judgment for plaintiff.